**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:10cv028**

| | | |
|---|---|---|
| **DELPHINE BRYAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary

Judgment [Doc. 6-1] and the Defendant's Motion for Judgment on the

Pleadings. [Doc. 9].

**I. PROCEDURAL HISTORY**

The Plaintiff Delphine Bryan protectively filed an application for a period

of disability and disability insurance benefits on August 23, 2005 alleging that

she had become disabled as of February 15, 2002. [Transcript ("T.") 71]. The

Plaintiff's application was denied initially and on reconsideration. [T. 57-60,

52-4]. A hearing was held before Administrative Law Judge ("ALJ") Ivar Avots

on September 17, 2008. [T. 308-345]. On January 6, 2009, the ALJ issued

a decision denying the Plaintiff benefits. [T. 22-30]. The Appeals Council accepted additional evidence, but denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 8-11]. The Plaintiff has exhausted her available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III. THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets

or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's RFC, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## IV. FACTS AS STATED IN THE RECORD

The relevant facts of record are summarized as follows. Plaintiff alleges that she is disabled by a crush injury to her foot, degenerative disc disease, severe facet joint arthritis, spondylosis with myelopathy, trochanteric bursitis of the hip, sciatica, fibromyalgia-type pain, depression, and anxiety. [Doc. 6 at 2]. Plaintiff was 50 years old at the time of the ALJ's hearing. She completed high school. [T. 311-12]. Her past relevant work includes work as a salesperson and clerical work in the administration of employee benefits. [T. 316-18].

On June 12, 2001, Plaintiff dropped a bathtub on her left forefoot while working at the Gardener's Cottage in Biltmore Village. She immediately developed pain and swelling about the forefoot and ankle and had difficulty walking. Plaintiff received the majority of her relevant medical treatment for this injury from orthopedists at Blue Ridge Bone & Joint Clinic. [T. 137-220]. On October 12, 2001, Plaintiff was diagnosed as being status post crush injury to the left foot, with left ankle pain, adult acquired pas planus valgus deformity with grade II posterior tibial insufficiency of the left foot, left peroneal tendonitis, and left subtalar joint synotvitis. It was recommended that the Plaintiff use a CAM boot and avoid weight bearing. She was further limited in bending, stooping, twisting, kneeling, and climbing stairs and ladders. She was instructed not to lift more than fifteen pounds.

An MRI of Plaintiff's left ankle dated April 13, 2002 showed longitudinal intrasubstance tear of the posterior tibialis tendon, tenosynovitis and tendinopathy of the posterior tibialis tendon, peroneus longus and brevis tendons, and tenosynovitis of the flexor hallucis and flexor digitorum tendon sheaths. [T. 211]. On July 8, 2002, she underwent left calcaneal osteotomy with posterior tibial tendon debridement. [T. 206]. Aggressive physical therapy was recommended on October 7, 2002. It was noted that she "may"

comply. [T. 203]. Throughout her treatment with Blue Ridge Bone and Joint, she used a cane, and her left calf remained atrophied in spite of several rounds of physical therapy. [T. 201].

On February 20, 2003, Plaintiff underwent outpatient surgery to have hardware removed from her left heel and to have her left Achilles tendon lengthened with a cast. [T. 199]. Two weeks later, she had only mild pain and spasms in her leg. [T. 198].

On May 14, 2003, physical therapy was also recommended for her right hip, a new source of complaint. She reported doing very well. Her left foot and ankle looked good, were well aligned, and were neurovascularly intact. She had ten degrees of dorsiflexion without difficulty. [T. 195-6]. On July 14, the midfoot, forefoot, and tibiotalar joint of the ankle were noted as being nonsensitive.

On October 13, 2003, Dr. Peter G. Mangone noted that there was good alignment and no significant swelling in the Plaintiff's left foot. Dr. Mangone wanted her to "really try to get off the cane. . . it [was] going to be vitally important for her to work on a regular basis to increase her strength." He recommended that she walk three or four times a week and continue light-duty work. [T. 191].

On December 22, 2003, it was noted that she had good alignment and satisfactory range of motion. The origin of her continued pain was noted as "perplexing." Although she complained of severe pain, her mannerisms were much more sedate; Dr. Mangone suspected that Plaintiff was "hypersensitive." [T. 189].

On February 2, 2004, Dr. Mangone found Plaintiff to be at maximum medical improvement (MMI) as to her foot. It was noted, however, that Plaintiff's back pain was severe and was persisting even with sitting. On August 23, 2004, Dr. Mangone noted that Plaintiff still had diffuse pain complaints. Her examination, however, was "very benign." [T. 180]. He further noted that Plaintiff's behavior belied her complaints of pain. For example, Dr. Mangone noted that when she did not know he was watching, she bore weight on her left foot with no visible pain, and tapped her left foot. [T. 181].

Plaintiff began physical therapy for her back in September 2004. [T. 176-8, 168-172]. On September 13, 2004, Plaintiff saw Dr. Hedrick for a second opinion. He found her to have acquired and posttraumatic pes planovalgus foot deformity secondary to posterior tib insufficiency with appropriate surgical intervention and good objective result, but with persistent

subjective pain.  [T. 174].  He recommended that she wear appropriate shoes and orthotics.  [T. 175].

An MRI of Plaintiff's lumbar spine dated October 14, 2004 demonstrated mild degenerative disc disease at L5-S1.  [T. 166].  On February 1, 2005, severe facet joint arthritis was noted as a diagnosis for the first time.  Although facet joint arthritis was not mentioned on the actual MRI report [T. 166], the February 1 office note declared that it was more "impressive" than her disc degeneration.  [T. 164].  Two steroid injections made in the L5-S1 joint area [T. 159-60] relieved the pain for a few days each.  [T. 156, 164].

On April 21, 2005, lumbar spondylosis with facet joint arthropathy and mild degenerative disc changes at L5-S1 were noted.  [T. 155].  While Plaintiff reported that a bilateral L5-S1 facet joint nerve block provided no relief, it was noted that straight leg raising was negative bilaterally and that her strength was intact.  [T. 147].  She reported that she rode her stationary bike approximately four miles a day.  [T. 141].

On May 26, 2008, a physical evaluation was performed for Disability Determination Services (DDS) by Dale Mabe, D.O.  [T. 276-80].  The Plaintiff claimed limitations to twenty minutes of sitting, standing, walking (due to pain) and riding in a car (due to anxiety).  [T. 280].  Dr. Mabe recommended an x-

ray and further treatment of her left foot, and further orthopedic treatment of her back, which had pain "with attempt." [T. 280].

In a Medical Source Statement, Dr. Mabe noted that Plaintiff's left calf was smaller than her right, which suggested that she avoided left foot ambulating. [T. 282]. He noted that Plaintiff had an unsteady gait with pivot and turn. [T. 286]. He further noted that Plaintiff reported being ordered to use a cane at all times. [T. 276]. Dr. Mabe found Plaintiff's range of motion to be minimal in extension and rotation of her lumbar spine and in dorsiflexion of her left ankle. He noted that all motion in her left foot was significantly reduced. [T. 287].

Plaintiff's physical residual functional capacity (RFC) was assessed for DDS on September 14, 2005 by Sankar Kumar, M.D. Dr. Kumar concluded that Plaintiff was capable of medium work, with some additional postural limitations. [T. 129-136].

Plaintiff's primary care physician was Dr. Kevin Treakle of Asheville Family Medicine. [T. 271-5, 288, 301-2]. Prior to her date last insured (DLI), she saw Dr. Treakle a total of six times. On March 28, 2001, Dr. Treakle noted Plaintiff's "fibromyalgia type complaints" and recommended low-impact aerobics and stretching to increase her range of motion and strength and to

relieve pain. Plaintiff declined an offer of muscle relaxants for her primary complaint of neck and shoulder pain. [T. 274]. On September 3, 2004, Dr. Treakle noted that Plaintiff had gained significant weight due to inactivity, and that she preferred to try dieting instead of exercise to control it. [T. 273]. He further noted that she still used a cane. Although inactivity and the presence of her foot impairment were noted, Dr. Treakle made no note of any complaints of foot or back pain. He did note that she complained occasionally of vertigo, but that she refused available treatments. [T. 271]. He first noted the possibility of a panic disorder on April 19, 2007. [T. 271].

Dr. Treakle provided an RFC assessment on March 11, 2008. [T. 268-70]. Although he circled "No" to the question whether it was based on her subjective statements [T. 270], several other notations indicate that his opinion in fact was based upon Plaintiff's own description to him of what she could and could not do. [See T. 269, 270, 288]. Dr. Treakle found Plaintiff capable of lifting less than ten pounds, and of sitting and standing less than twenty minutes.

Plaintiff made five visits to Farrell Chiropractic during September of 2005, and returned for two more visits in March 2006. [T. 221-233]. During these visits, she reported severe chronic low back pain, rated as six out of

ten, and affecting her activity at six to eight out of ten. She reported that injections and physical therapy had not helped. It was noted that her range of motion was limited, and that straight leg raising was positive on the left. It was further noted that she had spasm and pain at the lumbar and right gluteal muscle. Heel and toe walk was normal. Plaintiff was treated with low force spinal manipulation, electrical muscle stimulation, ultrasound, and instrument assisted soft tissue mobilization. She was instructed in various stretches and strengthening exercises. [T. 224]. On March 20, 2006, she reported only occasional severe low back pain. [T. 221].

With respect to her mental health, Plaintiff claims a history of anxiety, panic attacks, and depression. In a DDS evaluation conducted on October 6, 2005, Plaintiff reported that she was having no panic attacks or anxiety symptoms. She further reported that she had been off of anxiety medications since 2001, and that those had been required for a situational problem. [T. 98]. A Case Analysis performed by Steven Salmony, Ph.D. on May 2, 2006 indicated that her depression was situational. She stated that "if she was physically able to do more, her depression would resolve." He recommended a finding that her depression was non-severe. [T. 235]. She received three sessions of supportive therapy in July and August 2007, and one session in

January 2008, at All Souls Counseling. [T. 257-67]. At her initial appointment, she said she had not had a "severe attack in a long time." [T. 265]. Plaintiff declined to try any medications, indicating a past dependence on Xanax and sensitivity to prescription medications, detailing varying adverse reactions she had to different ones in the past. Neurontin was recommended for pain on November 20, 2007, but there is no evidence that she took any. She did not return to these providers until late January 2008, when she asked for a change of therapist. [T. 264]. She did not visit that new therapist, Joell Steininger, LCSW until July 2008, two months before her hearing. She had ten visits for supportive therapy [T. 298] from July 9, 2008 through July 21, 2009. [T. 298-300]. Ms. Steininger's Initial Assessment notes include Plaintiff's complaint that she had experienced panic attacks since age 31. After two visits, Ms. Steininger provided a Medical Source Statement of Ability to do Work-Related Activities (Mental). [T. 295-7]. She diagnosed Plaintiff with Panic Disorder with agoraphobia, a Global Assessment of Functioning Score (GAF) of 40 (100 point scale), and seven "marked" restrictions out of ten evaluated work-related mental activities. She noted that Plaintiff "won't leave the house," was "unable to drive," and "cannot focus or remember much of anything." This degree of limitation was noted as persisting since 1989.

At the ALJ hearing, Plaintiff testified that she could not drive more than seven to ten miles at a time. [T. 312]. She testified that she can lift no more than a gallon of milk due to foot, back and right hand pain. [T. 320]. She testified that she can stand and sit comfortably for twenty minutes at a time. [T. 321-2].

Plaintiff testified that she has used a cane since her first surgery. She reported that walking from the parking deck to the hearing was very difficult. She stated that she could maneuver around her house without her cane, but that when she has tried to do more without the cane, she has fallen. [T. 323]. She testified that she uses hot and cold packs alternatively on her back to relieve pain. She stated that she uses no prescription medications, because she had not had insurance for several years, but she has taken over-the-counter medications for pain. [T. 323, 326].

Plaintiff testified that she sleeps about four hours per night. [T. 323-4]. She stated that she will lie down two to three times a day for up to an hour at a time. She reported her back and foot pain to be an eight on a ten point scale . [T. 325-6]. Plaintiff testified that pain affects her ability to concentrate, and that she has difficulty with her memory. [T. 326, 330].

Plaintiff testified that she suffers from panic attacks and anxiety, and that she does better when she is not around a lot of people. [T. 328]. Her panic

attacks last anywhere from thirty minutes to three hours. [T. 329]. When asked why she did not take any psychotropic medications, Plaintiff described herself as very drug sensitive. [T. 331].

With respect to activities of daily living, Plaintiff testified that she reads and cooks simple meals. She does not do laundry. [T. 330]. Plaintiff testified that she uses a seat in her shower since standing causes pain. [T. 332]. She stated that she usually rises at 7:30 a.m. and tries to complete her activities by 1p.m., at which time she is "just done in for the day." [T. 332]. She reported that she does not participate in any outdoor activities and does not visit with friends. She does not watch much television. [T. 334].

Charlie A. Edwards, Ph.D. was sworn to testify as a vocational expert (VE). [T. 336-44]. When asked a hypothetical question setting forth the Plaintiff's sedentary RFC as assessed by the ALJ, the VE identified several jobs in the national economy, including telephone marketing/receptionist, cashier, and hand packer, that she could perform. While noting that the positions of cashier and hand packer are described in the Dictionary of Occupational Titles (DOT) as light, the VE explained that these jobs could also be performed at the sedentary level, and therefore, he felt that his testimony was consistent with the DOT. [T. 343].

## V.    THE ALJ'S DECISION

On January 6, 2009, the ALJ issued a decision denying the Plaintiff's claim. [T. 22-30].  Proceeding to the sequential evaluation, the ALJ found that the Plaintiff's date last insured was March 31, 2007 and that she had not engaged in any substantial gainful activity since February 15, 2002.  [T. 24]. The ALJ then determined that the Plaintiff has the following severe impairments: status post crush injury of the left foot and probable mild degenerative disc disease.    [T. 24].    The ALJ concluded that her impairments, either singly or in combination, did not meet or equal a listing. [T. 25].

The ALJ then determined that Plaintiff retained the residual functional capacity to perform a reduced range of sedentary work.  [T. 25].  He found that Plaintiff was unable to perform her past relevant work; that she was a younger individual with a high school education; and that she had transferable job skills since her past work was semi-skilled.  [T. 28-29].   At step five, the ALJ, relying upon the vocational expert testimony, concluded that significant work exists in the national economy that Plaintiff could perform.   [T. 29]. Accordingly, he concluded that the Plaintiff was not disabled from February 15, 2002 through her date last insured.  [T. 30].

## VI.    DISCUSSION

On appeal, Plaintiff argues that the ALJ erred in failing to find certain of her impairments severe; in evaluating her credibility; in assessing her residual functional capacity; in weighing the medical source evidence of record; and in resolving conflicts in the VE's testimony.

## A.    The ALJ's step two evaluation followed applicable law and was supported by substantial evidence.

Plaintiff first complains that the ALJ erred in failing to find her facet joint arthritis and lumbar spondylosis to be severe impairments.  She argues that she was prejudiced by this failure because the ALJ concluded that there was an insufficient showing of conditions that could cause pain so as to trigger an evaluation of her pain at step four of the sequential evaluation process.  The Court finds this argument to be without merit.

There is substantial evidence to support the ALJ's determination that Plaintiff's facet joint arthritis and lumbar spondylosis are not severe impairments.  While the record does indicate that the Plaintiff was diagnosed with these conditions during the relevant time period, simply being diagnosed with an impairment does not mean that the impairment is severe.  Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988).   At least *de minimis* limitations must result from an impairment in order for it to be found severe.  McCrea v.

Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). The record, however, does not indicate any additional exertional or non-exertional limitations that resulted during or after the period in which those two conditions were diagnosed. Further, the record does not indicate any change in her reports of pain or other symptoms as being related to these impairments. As such, the ALJ did not err in concluding that these conditions were not severe impairments.

In any event, the ALJ found other conditions (namely, degenerative disc disease) that could reasonably be expected to cause the type of pain that she alleges. The existence of this condition triggered the ALJ's evaluation of her pain at step four, an assessment which was performed, as discussed in greater detail below, without error. Thus, Plaintiff cannot demonstrate any prejudice resulting from the ALJ's failure to find these additional pain-causing conditions to be severe.

**B. The ALJ properly evaluated Plaintiff's credibility pursuant to applicable law, and his findings were supported by substantial evidence.**

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) . . .which

could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir.1996). If there is such evidence, the ALJ must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects his ability to work." Id. at 595.

Having found that the Plaintiff suffered from a severe impairment, namely degenerative disc disease, and that such condition could reasonably be expected to cause the type of pain and other symptoms alleged, the ALJ proceeded to analyze the evidence presented by Plaintiff relating to her pain and limitations. While his notations about her testimony are few, the Court's review confirms that there is substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not entirely credible. Review of the record reveals that Plaintiff's testimony regarding her disabling pain and other symptoms conflicts with her own reports to her treating physicians. For example, Plaintiff repeatedly downplayed her depression, anxiety, and panic attack symptoms to her medical providers. [See, e.g., T. 98, 238, 247, 259, 271]. Additionally, the medical records indicate that Plaintiff regularly resisted offers of treatment, including the prescribing of medication. [T. 247, 266, 274, 301, 302, 264, 240]. While Plaintiff testified that she regularly uses a cane,

and cited such use as being exemplary of her pain and limitations, the medical records demonstrate that she was urged repeatedly to stop using it. Further, her testimony that she would fall without using a cane is not borne out by her reports to doctors. "In considering the credibility of the claimant's subjective allegations of pain, the ALJ must consider (factors which include) the extensiveness of the attempts (medical or nonmedical) to obtain relief....". McKenney v. Apfel, 38 F.Supp.2d 1249, 1259 (D. Kan. 1999) (citing Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991)); see also Benson-White v. Astrue, No. 0-08-2366-HFF-PJG, 2009 WL 2988694, at *8 (D.S.C. Sep. 17, 2009).

As the ALJ noted, Plaintiff's testimony did not establish limitations incompatible with sedentary work. Further, her orthopedists noted no objective limitations as of the last time she had visited them. Indeed, their encouragement of greater activity suggests that Plaintiff was capable of more than she chose to do. While some orthopedic reports indicate that she was working hard in physical therapy, the contemporaneous reports of her atrophied left calf were inconsistent with that assessment. Finally, the ALJ's notation that Plaintiff "sat like a rock" throughout the hearing is consistent with

her orthopedists' several notes that her demeanor and behavior suggested much less severity than her verbalized complaints did.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).  The ALJ's findings regarding the Plaintiff's credibility were supported by substantial evidence, and amply support his conclusion that Plaintiff's evidence did not support limitations greater than the sedentary capacity stated in his RFC assessment.

**C.     The ALJ's assessment of medical source evidence both from Dr. Mabe and Dr. Treakle followed applicable law, and his findings formed substantial evidence for his detailed RFC assessment.**

Plaintiff next argues that the ALJ erred in rejecting Dr. Mabe's opinion on the sole basis that such assessment occurred after Plaintiff's date last insured (DLI).  She further argues that the ALJ erred in rejecting the opinion of Dr. Treakle in the absence of any evidence to the contrary.

Regulations dictate the ALJ's process for evaluating medical source evidence:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the

> following factors in deciding the weight we give to any
> medical opinion: (1) Examining relationship; (2)
> Treatment relationship; (i) Length of the treatment
> relationship and the frequency of examination.(ii)
> Nature and extent of the treatment relationship.

20 C.F.R. § 404.1527(d).

The RFC is comprised of findings about Plaintiff's capacity to perform

physical and mental work functions.  SSR 96-8p.  Some accepted medical

source's evidence must be the basis of an ALJ's opinion on RFC; the ALJ

"may not make speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of contradictory medical

evidence and not due to his or her own credibility judgments, speculation, or

lay opinion."  McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002)

(quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)).

Plaintiff asserts that SSR 83-20 precludes use of the DLI to bar

consideration of Dr. Mabe's opinion.  Contrary to Plaintiff's argument,

however, the ALJ did not use the DLI as a justification to bar consideration of

this evidence; rather, the timing of Dr. Mabe's opinion was just one of three

reasons cited for rejecting it.  In addition to noting that Dr. Mabe's opinion was

rendered after Plaintiff's DLI, the ALJ found that Dr. Mabe's opinion was

inconsistent with the medical evidence of record and conflicted with the

clinical findings of the other medical sources, facts which Plaintiff does not

dispute. There is substantial evidence to support the ALJ's rejection of Dr. Mabe's opinion.

With respect to Dr. Treakle, the record reflects that Plaintiff saw Dr. Treakle only six times before her DLI. The ALJ noted that Dr. Treakle's opinion was not supported by objective medical findings, and there is substantial evidence to support this assessment. Indeed, there is nothing in Dr. Treakle's treatment records, either before or after Plaintiff's DLI, to suggest any limitations of Plaintiff's mental or physical work functions. She never complained of back pain to Dr. Treakle, and he only first noted a possible panic disorder in 2007. Moreover, as noted by the ALJ, Dr. Treakle's opinion is based entirely on Plaintiff's subjective complaints and is not supported objective medical findings. Accordingly, the ALJ did not err in rejecting this opinion evidence.

**D.     The ALJ's reliance on vocational expert followed applicable law and was supported by substantial evidence.**

Next, Plaintiff contests the ALJ's reliance on the VE's testimony that certain jobs which are classified by the DOT as light work could be performed by someone with sedentary limitations.

Social Security Ruling 00-4p governs how an ALJ may use vocational expert testimony:

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. Id. at *4. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p at *4. To the extent that any conflict arose in the course of the VE's testimony, Plaintiff made no effort to address such conflict at the hearing. Plaintiff is not entitled to a second chance to cross-examine the VE on appeal. Mills v. Apfel, 244 F.3d 1 (1st Cir. 2001); Cf., Sims v. Apfel, 530 U.S. 103, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000). In any event, Plaintiff has not attempted to explain in any detail how the VE's testimony under further examination by the ALJ was insufficient to resolve any such conflict between his testimony and the DOT. As such, the Court concludes that the ALJ's reliance on the VE's testimony was appropriate and supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding that the Plaintiff was not disabled through the date of his decision.

# O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 9] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 6-1] is **DENIED**.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: September 19, 2011

Martin Reidinger
United States District Judge